# Supreme Court of Florida

_____

No. SC15-1795
_____

**JUAN DAVID RODRIGUEZ,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[April 20, 2017]

PER CURIAM.

This case is before this Court on appeal from an order denying a motion to vacate a sentence of death under Florida Rule of Criminal Procedure 3.851. We have jurisdiction under article V, section 3(b)(1), Florida Constitution. For the reasons that follow, we affirm the judgment and sentence.

## FACTS AND PROCEDURAL HISTORY

The instant case is Juan David Rodriguez's second successive postconviction appeal. "Juan David Rodriguez was convicted of first-degree murder, armed robbery, conspiracy to commit a felony, attempted armed robbery, armed burglary with an assault, aggravated assault, and attempted first-degree

murder." Rodriguez v. State (Rodriguez I), 609 So. 2d 493, 495 (Fla. 1992). Rodriguez's convictions stem from a shooting at a shopping center on May 13, 1988, and an attempted home invasion robbery the next day. The facts are summarized in detail in Rodriguez's direct appeal. Id. at 495-97. We briefly discuss the facts as they relate to Rodriguez's postconviction claims.

Seeking to discharge a debt, Rodriguez led Ramon Fernandez and Carlos "Tata" Sponsa to a shopping center. Id. at 495. Rodriguez accosted Abelardo Saladrigas in the shopping center parking lot, shot him, and took his watch and briefcase, which held cash and a revolver. Id. at 496. Saladrigas died after hospitalization. Id. Eye-witnesses observed the attack and the men fleeing in a blue Mazda. Id. at 495.

The next day, Rodriguez joined Fernandez, Sponsa, and several other men at a residence to stage a home invasion robbery. Rodriguez v. State (Rodriguez II), 919 So. 2d 1252, 1259 (Fla. 2005). On the way to the residence, Rodriguez told Sergio Valdez about the shooting in the shopping center parking lot. Id. The owner of the residence averted the home invasion by firing a gun at the men. Id. Fernandez dropped the stolen revolver from the previous day as the men ran from the home. Id. at 1260. When arrested, Fernandez confessed, told police about his role in the shopping center shooting, and described Rodriguez's involvement. Id. Rodriguez was arrested, charged, and found guilty of all charges. Id.

- 2 -

Prior to the penalty phase, Rodriguez moved for appointment of a mental health expert to evaluate him for mitigation, and the trial court granted the motion. Id. at 1270. Dr. Leonard Haber testified that Rodriguez claimed to have left school after the first grade to work and that he demonstrated a lack of effort during Dr. Haber's evaluation. Id. Dr. Haber found signs that Rodriguez might be brain damaged, but determined that "the activities in which Rodriguez engaged . . . belied a finding of [intellectual disability]." Id. at 1265. Dr. Haber suggested further testing, which Dr. Noble David conducted and which revealed that Rodriguez was normal.

The penalty phase began on March 25, 1990:

> Rodriguez was found guilty of all charges which were tried together. By a vote of twelve to zero the jury recommended that he be sentenced to death in connection with the Saladrigas murder. The court followed this recommendation, finding three aggravating factors: 1) prior conviction of violent felony; 2) the murder was committed during a robbery and for financial gain; and 3) the murder was especially heinous, atrocious, or cruel, and one nonstatutory mitigating factor: Rodriguez had a good marriage and family life.

Rodriguez I, 609 So. 2d at 497. Rodriguez raised multiple claims related to his guilt and penalty phases on direct appeal,[1] and this Court affirmed his death sentence. Id. at 501.

_____

1. Rodriguez raised the following guilt phase claims on direct appeal:

(1) It was error to compel him to proceed without the presence of a defense witness and to refuse to permit him to introduce that witness's

Rodriguez filed his initial postconviction motion on September 12, 1994,

and filed amended motions in October 1995, April 1997, and July 1997.[2]

prior deposition testimony; 2) it was fundamental error to conduct a
joint trial for the first-degree murder and the charges stemming from
the attempted home invasion; 3) it was error to admit the victim's
sister-in-law's identification testimony; and 4) inadmissible hearsay
testimony was introduced to improperly bolster the testimony of the
State's chief witnesses.

Rodriguez I, 609 So. 2d at 497. Rodriguez raised the following penalty phase
claims:

(1) the death penalty is disproportionate in this case; 2) the
prosecutor's comments on the defendant's demeanor off the witness
stand rendered the sentencing proceedings unfair; 3) the homicide
was not heinous, atrocious, or cruel; 4) the sentencing order is
deficient and reflects that the trial court failed to consider certain
mitigating factors; 5) the trial court considered the impassioned pleas
of family members, contrary to Booth v. Maryland, 482 U.S. 496
(1987), overruled by Payne v. Tennessee, 501 U.S. 808 (1991); and
6) Florida's death penalty statute is unconstitutional.

Id. at 500.

2. Rodriguez raised 12 issues regarding the original denial of postconviction
relief and three claims relating to relinquishment of jurisdiction:

(1) [T]he trial court erred in denying a new penalty phase where the
evidentiary hearing showed that trial counsel failed to investigate and
present mental health mitigation and the mental health expert rendered
inadequate mental health assistance; (2) the trial court erred in
allowing the State to prepare the sentencing order; (3) the trial court
erred in summarily denying his claims of a Brady[ v. Maryland, 37
U.S. 83 (1963)] violation based on the State's failure to disclose
information concerning Tata, an Ake[ v. Oklahoma, 470 U.S. 68
(1985)] violation based on failure to provide him with an adequate
mental health evaluation, and ineffective assistance of trial counsel
based on counsel's failure to investigate or prepare for trial, to request

Rodriguez II, 919 So. 2d at 1260.  Following a Huff[3] hearing, the circuit court granted an evidentiary hearing on two ineffective assistance of trial counsel claims relating to his alleged intellectual disability.  Id. at 1260-61.  Both Dr. Haber, who evaluated Rodriguez for trial, and Dr. Latterner, who evaluated Rodriguez for his postconviction claims, testified at the hearing.  Id. at 1275.  Dr. Latterner's evaluation contradicted Dr. Haber's findings.

---

a severance of offenses, and to object to various other errors at trial; (4) Rodriguez was denied effective assistance of counsel due to the failure of various agencies to comply with his public records requests; (5) the trial judge displayed judicial bias at trial and during the postconviction proceedings; (6) trial counsel was ineffective in failing to object to jury instructions regarding the aggravating circumstances, burden shifting, the jury's responsibility for sentencing, and an automatic aggravating circumstance; (7) prosecutorial misconduct occurred during the closing argument; (8) the Florida death penalty statute is unconstitutional; (9) an incomplete record on direct appeal led to ineffective assistance of counsel; (10) the Rule Regulating the Florida Bar 4-3.5(d)(4) prohibition on communication with jurors restricts Rodriguez's access to the courts; (11) impermissible victim impact was considered in Rodriguez's sentencing; and (12) Rodriguez did not receive a fundamentally fair trial because of cumulative error. . . . (13) [T]he trial judge should have disqualified himself from presiding over Rodriguez's original postconviction proceedings; (14) he was not afforded a full and fair hearing on the sentencing order issue during relinquishment of jurisdiction; and (15) the trial court erred in denying him relief on the merits of the sentencing order issue after the evidentiary hearing.

Rodriguez II, 919 So. 2d at 1262.

3.  Huff v. State, 622 So. 2d 982 (Fla. 1993).

Dr. Latterner assessed Rodriguez with an IQ score of 64, found he was likely to have been born intellectually disabled, and opined that Rodriguez had difficulty appreciating the criminality of his actions and conforming his behavior to the law. Id. at 1265-66. Based on the conflicting expert testimony and Rodriguez's courtroom behavior, which demonstrated awareness and understanding of the proceedings, the circuit court found that while Rodriguez had a low IQ, he was not intellectually disabled. Id. at 1266. This Court concluded that because Rodriguez was not intellectually disabled, he could not establish that any alleged deficiency of trial counsel prejudiced him for the purposes of his ineffective assistance of counsel claims. Id. at 1267. This Court also denied Rodriguez's petition for habeas corpus relief.[4] Id. at 1259.

The circuit court summarily denied Rodriguez's first successive postconviction motion.[5] This Court remanded the summary denial for an

---

4. In his habeas petition, "Rodriguez raise[d] several claims of ineffective assistance of appellate counsel. He also question[ed] this Court's harmless error analysis on direct appeal and ask[ed] this Court to revisit the constitutionality of his indictment in light of the subsequent decisions in Apprendi v. New Jersey, 530 U.S. 466 (2000), and Ring v. Arizona, 536 U.S. 584 (2002)." Rodriguez II, 919 So. 2d at 1262.

5. Rodriguez's first successive postconviction motion raised two claims: (1) Rodriguez is intellectually disabled under Atkins v. Virginia, 536 U.S. 304 (2002); and (2) Florida Rule of Criminal Procedure 3.203 violates the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Rodriguez II, 919 So. 2d at 1267.

evidentiary hearing on Rodriguez's intellectual disability claim. Rodriguez v. State (Rodriguez III), 968 So. 2d 557 (Fla. 2007) (table). The circuit court held the evidentiary hearing on January 3, 2011, and subsequently denied relief. Rodriguez appealed, and this Court determined that Rodriguez failed to demonstrate adaptive behavior deficits or a reliable IQ score below 70. Rodriguez v. State (Rodriguez IV), 2013 WL 462069 (Fla. Feb. 6, 2013).

On December 19, 2013, Rodriguez filed a habeas petition in the Southern District of Florida, which was ultimately denied after the Southern District denied a motion to stay pending the determination of Hall v. Florida, 134 S. Ct. 1986 (2014). Order Denying Petition, Rodriguez v. State, Case No. 13-cv-62567 (S.D. Fla. Jan. 4, 2016). Rodriguez filed a second successive motion for postconviction relief on May 26, 2015. Rodriguez claimed that Hall entitled him to further litigate his intellectual disability claim.

The circuit court conducted a Huff hearing on his intellectual disability claim at which Rodriguez agreed that he had presented evidence regarding all the elements of intellectual disability in prior proceedings. Rodriguez claimed that he was entitled to a new evidentiary hearing under Hall because Hall made improper the requirement of concurrent adaptive deficits to establish intellectual disability. Over the State's objection, the circuit court allowed Rodriguez to file a memorandum of law containing additional arguments following the Huff hearing.

- 7 -

Rodriguez's subsequent memorandum argued that he had satisfied all pleading requirements of Florida Rule of Criminal Procedure 3.851 and that evidence from his prior hearings had been improperly evaluated under Hall. The circuit court summarily denied the second successive postconviction motion, finding that Rodriguez's prior evidentiary hearing on intellectual disability and other proceedings provided him with the full protections afforded by Atkins and Hall.

**ANALYSIS**

Rodriguez appealed the circuit court's denial of his Hall claim on February 19, 2016. Rodriguez also filed in this Court a motion requesting permission for supplemental briefing on Hurst v. Florida, 136 S. Ct. 616 (2016), which was decided January 12, 2016. This Court allowed the supplemental briefing, and Rodriguez challenged his death sentence as unconstitutional under Hurst. We address both Rodriguez's Hall and Hurst claims.

**I. Whether Rodriguez is Entitled to Relief under Hall**

Rodriguez argues that the circuit court erred in refusing to grant an evidentiary hearing on his intellectual disability claim. A circuit court may summarily deny a claim if it is legally insufficient or positively refuted by the record. Mann v. State, 112 So. 3d 1158, 1161 (Fla. 2013). A decision on whether

to grant an evidentiary hearing for a successive postconviction motion is a pure question of law reviewed de novo. Id. at 1162.

This Court has determined that Hall is retroactive under Witt v. State, 387 So. 2d 922 (Fla. 1980). Walls v. State, 41 Fla. L. Weekly S466, S469 (Fla. Oct. 20, 2016). Thus, we must determine whether Hall requires relief in this case. Hall established that Florida courts should allow defendants with IQ scores above 70 to present evidence of the other prongs of intellectual disability at an evidentiary hearing. This Court has also interpreted Hall to mean that no single factor may be dispositive and that "if one of the prongs is relatively less strong, a finding of intellectual disability may still be warranted based on the strength of the other prongs." Oats v. State, 181 So. 3d 457, 467-68 (Fla. 2015). Rodriguez argues that Hall also requires postconviction courts to make all determinations, including credibility findings, in a manner deferential to the standards of the medical community and that the use of those standards entitles him to a new evidentiary hearing.

In summarily denying the claim, the circuit court below considered the entire record and the evidence presented at Rodriguez's July 20, 2015, Huff hearing. The circuit court determined that Rodriguez received the full benefit of the protection provided by Atkins and Hall in prior proceedings. To determine whether summary denial was appropriate, this Court must determine whether Hall

- 9 -

requires increased deference to the standards of the medical community. We also consider whether the record conclusively refutes Rodriguez's claim that the circuit court below improperly relied upon one single factor and it was dispositive in violation of Oats and Hall. Finally, we consider whether Rodriguez is entitled to a new evidentiary hearing based on the changes in Hall in light of similar cases.

## A. Whether Hall Requires Courts to Make Credibility Findings in Accordance with Medical Authorities

Rodriguez contends that his prior evidentiary hearing does not comport with Hall because the circuit court made credibility findings that conflict with medical standards not in evidence. Specifically, Rodriguez contends that credibility findings made by the circuit court contradict medical standards detailed in a publication of the American Association on Intellectual and Developmental Disabilities (AAIDD). See American Association on Intellectual and Developmental Disabilities, The Death Penalty and Intellectual Disability, (Edward A. Polloway, ed., 2015). Rodriguez also contends that Cardona v. State, 185 So. 3d 514 (Fla. 2016), supports his position because it held that a circuit court wrongfully discarded the opinions of medical experts in evaluating intellectual disability. Id. at 527. Rodriguez further argues that he is entitled to a new evidentiary hearing because Jones v. State, 966 So. 2d 319 (Fla. 2007), guided the previous determination regarding his disability in violation of Hall. We affirm the

summary denial below because Rodriguez's claims are conclusively refuted by the record.  See Mann, 112 So. 3d at 1162.

The language Rodriguez cites in Hall does not stand for the proposition that credibility findings are improper when they conflict with medical standards. Instead, the language justifies the expansion of Florida's definition of intellectual disability to encompass more individuals than just those with full-scale IQ scores below 70.  See Hall, 134 S. Ct. at 1993-95.  Hall looks to the medical community "[t]o determine if Florida's cutoff rule is valid," but does not change credibility determinations in intellectual disability proceedings.  Id. at 1993.  The United States Supreme Court has clarified that "Hall indicated that being informed by the medical community does not demand adherence to everything stated in the latest medical guide."  Moore v. Texas, 2017 WL 1136278, slip op. at 10 (March 28, 2017).[6]  This Court does not reweigh evidence or second guess a circuit court's credibility determinations.  Nixon v. State, 2 So. 3d 137, 141 (Fla. 2009) (quoting Brown v. State, 959 So. 2d 146, 149 (Fla. 2007)).

Even if Hall increases deference to medical standards as Rodriguez claims, the circuit court in the prior proceeding weighed the testimony of multiple experts

---

6. Unlike the defendant in Moore, Rodriguez's intellectual disability was evaluated under "the generally accepted, uncontroversial intellectual-disability diagnostic definition," and this Court follows the same three-part standard.  Moore, 2017 WL 1136278, slip op. at 6.

and made its findings based on competent, substantial evidence. See Rodriguez IV, 110 So. 3d at 441. Dr. Weinstein evaluated Rodriguez's IQ using the Mexican WAIS-III test and United States norms and testified that he believed Rodriguez was intellectually disabled. Dr. Suarez opined that the appropriate test for a Cuban immigrant like Rodriguez was not the Mexican WAIS-III but the Spanish version because Cuban culture more closely aligns with Spanish culture. Dr. Suarez further opined that the proper way to accommodate Rodriguez using the Mexican WAIS-III would be to use Mexican norms to obtain scaled scores and United States norms to calculate the final score. Dr. Suarez also testified that according to his tests, Rodriguez was malingering and that none of his IQ scores below 70 were reliable. Doctors Tasse and Oakland also offered expert opinions on evaluating intellectual disability.

The circuit court ultimately found Dr. Suarez's testimony most credible. The circuit court agreed that the Mexican WAIS-III test administered by Dr. Weinstein was unreliable because Rodriguez was not a member of the population with whom the test is intended to be used. The circuit court also determined that the IQ scores obtained by Dr. Suarez were unreliable because of Rodriguez's malingering. The circuit court also found that Rodriguez had not provided sufficient evidence to establish adaptive functioning deficits or onset before age

18. This Court does not reweigh evidence or second guess credibility findings on appeal. See Nixon, 2 So. 3d at 141.

Contrary to Rodriguez's claim, the circuit court did not disregard his IQ scores by simply ignoring expert opinions as occurred in Cardona, 185 So. 3d at 526-27. In Cardona, the circuit court disregarded tests that experts recommended for the Spanish-speaking, Cuban defendant based solely on the translation of tests from English to Spanish. Id. at 525-27. The circuit court in Cardona followed a rigid interpretation of the Florida Administrative Code, which permits only "specific tests . . . interpreted by trained personnel in conformance with the instructions provided by the producer of the test," rather than accepting the accommodations the experts "considered acceptable in the field in order to provide the best estimate possible as to [the defendant's] IQ, in light of the fact that the tests available to them were not as reliable in this situation." Id. at 526. The trial court in Cardona also failed to perform "a comprehensive analysis of all three prongs [of intellectual disability] as set forth in Hall and its progeny." Id. at 527. The circuit court's evaluation of Rodriguez's scores in this case does not suffer from the same errors.

Unlike Cardona, the circuit court in this case did not evaluate the IQ scores based on a strict reading of the Florida Administrative Code, but a careful weighing of all the evidence presented. The circuit court concluded that Dr.

- 13 -

Weinstein's administration of the test was unreliable based on Dr. Suarez's expert testimony about proper accommodations. The circuit court found the score Dr. Suarez obtained unreliable because of Rodriguez's malingering. The circuit court noted that even if the scores below 70 were reliable, Rodriguez had not demonstrated adaptive deficits or onset before age 18. The circuit court also considered all three prongs of intellectual disability, further distinguishing this case from Cardona.

Finally, Rodriguez contends that he is entitled to a new hearing because Jones, 966 So. 2d 319, guided the evaluation of his intellectual disability in a manner contradicting standard medical practices and, therefore, is in violation of Hall. In Jones, we rejected the argument that "in determining whether a person experiences deficits in adaptive functioning, only the person's childhood behavior is considered," in favor of evaluating both long-term and current adaptive functioning. Id. at 325-27. Medical standards indicate that experts cannot accurately evaluate adaptive functioning in a prison setting. See AAIDD, The Death Penalty and Intellectual Disability, supra, at 189. Rodriguez argues that to the extent that Jones requires a defendant to exhibit present deficits in adaptive functioning, Jones encourages the unreliable practice of evaluating defendants in prison. Rodriguez asks this Court to find that his prior proceeding violated Hall to the extent that the circuit court relied on Jones.

Even if Rodriguez's interpretation of Hall were correct, the circuit court considered more than just adaptive functioning testing conducted in prison. The circuit court evaluated long-term evidence, including testimony of Rodriguez's friends who knew him as a child, Dr. Weinstein's testimony regarding behavior alleged to demonstrate adaptive functioning deficits and regarding interviews of Rodriguez's friends and family, and testimony of other experts who either evaluated Rodriguez or testified to medical standards related to intellectual disability. While the circuit court followed Jones in considering IQ alongside present adaptive functioning, it also considered evidence from family and friends as Rodriguez argues that the AAIDD and Hall require.

Hall does not change the standards for credibility determinations in prior proceedings. The record conclusively refutes Rodriguez's claim because the circuit court made findings supported by competent, substantial evidence in prior proceedings. See Mann, 112 So. 3d at 1162.

## B. Whether One Factor Was Dispositive of Rodriguez's Intellectual Disability Claim in Violation of Oats

In applying Hall, this Court has held that the test for intellectual disability must include comprehensive analysis of all three prongs. See Oats, 181 So. 3d at 459, 467 (citing Brumfield v. Cain, 135 S. Ct. 2269, 2278-82 (2015)); Cardona, 185 So. 3d at 527. Rodriguez contends that the circuit court failed to evaluate all three prongs in tandem after his evidentiary hearing in the prior proceeding and

that this Court did not evaluate manifestation before age 18 in affirming the circuit court's decision. We affirm the circuit court's summary denial because the record conclusively refutes Rodriguez's claim. See Mann, 112 So. 3d at 1162.

The circuit court considered Rodriguez's current IQ and adaptive deficits based on the experts' tests and testimony. Dr. Weinstein believed that there was no need to demonstrate previous adaptive deficits before age 18, and the other experts disagreed. Rodriguez's friends familiar with him before age 18 testified that he had good hygiene, could care for himself, and could drive. The circuit court made findings as to Rodriguez's IQ, adaptive functioning deficits, and age of onset in its order finding that he is not intellectually disabled:

> The court finds that the results obtained from Dr. Weinstein on the Mexican WAIS III are not reliable. Dr. Weinstein conceded that IQ tests must be given to a representative example of the population with whom it is intended to be used. IQ norming, according to Dr. Suarez, takes into account a person's culture and level of education. He stated that if the person is not a member of the population that was used to formulate the norm, the results are meaningless. The full scale score of 60 obtained on the WAIS is invalid according to Dr. Suarez, who administered the test, because of the Defendant's malingering. There are no valid test results to establish that the Defendant's IQ is less than 70.
> Even if this Court accepts the IQ test results of Dr. Weinstein and it is assumed that the Defendant's IQ is less than 70, there is absolutely no evidence that Defendant exhibits deficits in his adaptive behavior and that they manifested before the age of 18. Dr. Weinstein testified that the Defendant leaving the Merchant Marines because he fell in love is an example of poor judgment. Millions of men who are not mentally retarded have left the military for a job, a family and even the love, or perceived love, of a woman. The fact that he may

have acted on impulse and not reasoning does not render him mentally retarded.

　　The Defendant has failed to carry his burden of proving the three elements necessary to establish that he is mentally retardation [sic]: significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18.

Given this discussion of all three prongs in the circuit court's order and the related evidence both in the record and described throughout the order, the record conclusively refutes Rodriguez's claim that the circuit court did not consider each prong of the intellectual disability test in tandem.

This Court did fail to discuss whether evidence below showed onset before age 18 in its opinion in affirming the circuit court's order. See Rodriguez IV, 110 So. 3d at 441. Nevertheless, this Court had the full record below at its disposal, including the circuit court's holistic review of all three prongs, in determining that Rodriguez had not demonstrated intellectual disability. See id. While Rodriguez is correct that this Court did not mention evidence of onset before age 18 in affirming the circuit court's decision, he cannot demonstrate that this Court did not consider the record, which shows no reliable evidence of early onset presented at his prior evidentiary hearing.

Summary denial was appropriate because the record reflects that the circuit court made findings as to all three prongs and evaluated them as a whole in denying Rodriguez's claim. See Mann, 112 So. 3d at 1162. Therefore, we deny

relief on this claim. Finally, we consider whether Rodriguez is entitled to an evidentiary hearing based on the changes in Hall in light of our recent decisions.

## C. Whether Rodriguez is Entitled to a New Evidentiary Hearing under Hall

Rodriguez contends that this Court cannot speculate as to whether Hall might affect the testimony of experts or how the defense presented his case at the prior hearing. While the change in Hall could have affected how the defense prepared, it is unlikely that the change would affect the outcome in this case. Rodriguez had IQ scores below 70 such that a finding of intellectual disability was possible prior to Hall, and Rodriguez's defense had every opportunity to present its best case at his prior Atkins evidentiary hearing. Therefore, this case is distinguishable from cases warranting Hall relief.

The facts in this case—specifically the findings made after the prior evidentiary hearing as to each prong of intellectual disability—distinguish this case from the clear Hall error this Court found in Oats, 181 So. 3d at 471, and Cardona, 185 So. 3d at 527. In Oats, the circuit court wrongfully determined that the defendant failed to establish onset before age 18 and limited its inquiry to that single prong in violation of Hall. Oats, 181 So. 3d at 471. In Cardona, the trial court wrongfully ignored expert recommendations as to the best language accommodation for IQ tests in rejecting the defendant's IQ scores and wrongfully found IQ dispositive of the holistic intellectual disability inquiry. 185 So. 3d at

525-27. In contrast, the circuit court considered evidence concerning all three prongs of intellectual disability in both Rodriguez's prior proceeding and in the summary denial below. In addition, Rodriguez introduced evidence of his intellectual disability at a hearing on his ineffective assistance of counsel claims during his initial postconviction proceeding, which this Court found insufficient to demonstrate intellectual disability. Rodriguez II, 919 So. 2d at 1267.

Rodriguez had a full Atkins evidentiary hearing, a prior hearing discussing his intellectual disability in relationship to an ineffective assistance of counsel claim, and a robust defense at each proceeding. Rodriguez's argument regarding Hall's effect on credibility determinations is legally insufficient. The record conclusively refutes his argument that one prong was dispositive of his claim. Based on the foregoing, we affirm the circuit court's summary denial of Rodriguez's Hall claim. Next, we turn to his claim under Hurst.

## II. Rodriguez is Not Entitled to Relief under Hurst

This Court has determined that Hurst should not be applied retroactively to those cases final on direct appeal before Ring was decided. Asay v. State, No. 41 Fla. L. Weekly S646, S648 (Fla. Dec. 22, 2016). Because Rodriguez's death sentence was final in 1993, Rodriguez is not entitled to Hurst relief. Therefore, we deny relief on this claim.

- 19 -

# CONCLUSION

Based on the foregoing, we affirm the circuit court's summary denial of an evidentiary hearing on Rodriguez's <u>Hall</u> claim, find that Rodriguez is ineligible for <u>Hurst</u> relief, and affirm his death sentence.

It is so ordered.

LABARGA, C.J., and LEWIS, and QUINCE, JJ., concur.
PARIENTE, CANADY, and POLSTON, JJ., concur in result.
LAWSON, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Miami-Dade County,
    Nushin G. Sayfie, Judge - Case No. 131988CF018180B000XX

Neal A. Dupree, Capital Collateral Regional Counsel, Rachel Day, Assistant Capital Collateral Regional Counsel, and Scott Gavin, Staff Attorney, Southern Region, Fort Lauderdale, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and C. Suzanne Bechard, Assistant Attorney General, Tampa, Florida,

    for Appellee